05 cv 10167 NMG

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RAYMOND TYLER, On Behalf of Himself and All Others Similarly Situated, | ) ) | No. |
| | ) ) | CLASS ACTION |
| Plaintiffs, | ) ) | |
| | ) ) | COMPLAINT FOR VIOLATION OF THE |
| vs. | ) | FEDERAL SECURITIES LAWS |
| | ) | |
| ASTRAZENECA PLC, PERCY BARNEVIK, TOM MCKILLOP, JONATHAN SYMONDS and HAKAN MOGREN, | ) ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) | |
| | ) | |

RECEIPT # _____

AMOUNT $ _____

SUMMONS ISSUED _____

LOCAL RULE 4.1 _____

WAIVER FORM _____

MCF ISSUED _____

BY DPTY. CLK. _____

DATE _____

MAGISTRATE JUDGE _____

## NATURE OF THE ACTION

1.     This is an action on behalf of purchasers of AstraZeneca PLC ("AstraZeneca" or the "Company") publicly-traded securities during the period from April 2, 2003 through October 11, 2004 (the "Class Period").

## JURISDICTION AND VENUE

2.     The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by §27 of the 1934 Act.

3.     Venue is proper pursuant to §27 of the 1934 Act as Defendant AstraZeneca and/or the Individual Defendants conduct business in and the wrongful conduct took place in this District.

4.     This Court has subject matter jurisdiction over the claims brought on behalf of investors who purchased or acquired AstraZeneca securities on foreign markets and/or who purchased AstraZeneca's American Depository Receipts ("ADRs") on the New York Stock Exchange("NYSE").

## THE PARTIES

5.     Plaintiff Raymond Tyler purchased AstraZeneca publicly traded securities as detailed in the attached Certification and incorporated by reference herein, and was damaged thereby.

6.     Defendant AstraZeneca PLC is a pharmaceutical research company specializing in research and development of drugs to treat cardiovascular, gastrointestinal, neuroscience, oncology, respiratory and inflammation and infection disorders. The Company's US headquarters are located at 35 Gatehouse Drive, Waltham, Massachusetts. As of December 31, 2003, AstraZeneca had 1,692,694,946 ordinary shares outstanding and approximately 41,000 holders of ADRs outstanding. The ADRs, each of which is equivalent to one Ordinary Share, are issued by JPMorgan Chase Bank and trade on the NYSE under the symbol AZN.

- 1 -

7.      Defendant Percy Barnevik ("Barnevik") serves as the Non-Executive Chairman of the Board of Directors of AstraZeneca. Barnevik assisted in the preparation of the false statements and sold 50% of his AstraZeneca holdings while in possession of material, non-public information, as alleged herein.

8.      Defendant Tom McKillop ("McKillop") served as Chief Executive Officer and Executive Director of AstraZeneca. McKillop assisted in the preparation of the false statements and repeated the contents therein to the market. McKillop sold stock while in possession of material, non-public information, as alleged herein.

9.      Defendant Jonathan Symonds ("Symonds") served as Chief Financial Officer and Executive Director of AstraZeneca. Symonds assisted in the preparation of the false statements and repeated the contents therein to the market. Symonds sold stock while in possession of material, non-public information, as alleged herein.

10.     Defendant Hakan Mogren ("Mogren") served as Deputy Chairman of the Board of Directors of AstraZeneca.

11.     Defendants Barnevik, McKillop, Symonds and Mogren are collectively referred to herein as the "Individual Defendants."

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

12.     On April 2, 2003, the Company issued a press release entitled "AstraZeneca's Investigational Oral Anticoagulant Studied as Alternative To Well-Controlled Warfarin for Stroke Prevention In Atrial Fibrillation; Results of Largest Stroke Prevention Trial Presented at ACC." The press release stated in relevant part that:

> Results of the largest stroke prevention trial ever conducted comparing AstraZeneca's investigational oral anticoagulant EXANTA (ximelagatran) to warfarin in patients with nonvalvular atrial fibrillation (NVAF) were presented today at the American College of Cardiology 52nd Annual Scientific Session in Chicago.

- 2 -

In SPORTIF III (Stroke Prevention by ORal Thrombin Inhibitor in atrial Fibrillation), an open-label, randomized, non-inferiority trial, patients treated with EXANTA (n=1,704) had 40 strokes and systemic embolic events compared to 56 strokes and systemic embolic events in patients treated with warfarin (n=1,703). For those patients remaining on treatment throughout the trial (on treatment analysis), patients receiving EXANTA had 29 strokes and systemic embolic events compared to 52 events for patients on warfarin, a statistically significant relative risk reduction of 41 percent (p=0.018).

SPORTIF III was conducted in 3,407 patients in 23 countries in Europe, Asia, Australia and New Zealand. In SPORTIF III, 1,704 patients with NVAF and at least one additional stroke risk factor received fixed-dose EXANTA (36 mg bid) and 1,703 patients received warfarin (dose-adjusted to an INR of 2-3). The SPORTIF program enrolled both newly-treated patients and patients that were already on warfarin therapy. Patients were treated for between 12 and 26 months. Warfarin was well controlled in the study with 66 percent of INR measurements between 2.0 and 3.0.

In SPORTIF III, there were 29 major (requiring hospitalization) bleeding events in the group receiving EXANTA compared to 41 in the warfarin arm (p=ns). In the trial, 6.5 percent of patients treated with EXANTA experienced an increase to greater than three times the upper limit of normal of a liver enzyme called ALT, compared to 0.7 percent of patients in the warfarin group. Nearly all enzyme changes occurred within the first six months of treatment and decreased with or without drug discontinuation. These results, together with those from previous and future studies in the clinical program for EXANTA, will form the overall benefit-risk profile for the product.

EXANTA is the first oral direct thrombin inhibitor under Phase III investigation and the first investigational oral anticoagulant agent to reach Phase III in more than 50 years. The intended mechanism of action of EXANTA is to inhibit the activity of an enzyme called thrombin, which is critical to the final step in the formation of blood clots. Ongoing clinical studies with EXANTA utilize a fixed dose without coagulation monitoring.

SPORTIF III is one of two Phase III trials of the SPORTIF program. The SPORTIF program includes 7,320 patients. Results of the North American part of the program, SPORTIF V, which includes 3,913 patients at 409 sites, are expected in late 2003.

13.    The Exanta trial was designed to show non-inferiority rather than superiority to warfarin, as much of Exanta's potential was considered to lie in its ease of use: it did not share warfarin's limitations of drug interactions, the need for coagulation monitoring and dose titration. Nevertheless, the reported incidence of stroke was 40 among Exanta-treated patients and 56 for the

warfarin group, which was said to represent a statistically-significant 41% relative risk reduction (p=0.018) among those patients who remained on treatment for the duration of the study. The rate was also reported to be numerically superior for Exanta if the entire patient group was assessed on an intent-to-treat basis. On the issue of safety, the report said there were 475 bleeding events in the Exanta group and 554 with warfarin, a statistically-significant difference (p=0.007). Liver enzyme elevation with AstraZeneca's drug occurred in 6.5% of patients, but was reported to be in line with the earlier SPORTIF II trial of the compound, and was said to be "transient, diminishing after six to eight months with patients recovering whether or not they stopped therapy."

14.      Following the Company's April 2nd press release, Merrill Lynch reported it expected Exanta's new drug application ("NDA") to be filed in the third quarter of fiscal 2003, with a launch in early 2005 in the USA and Europe, and was predicting $1.3 billion in sales in 2007.

15.      On Defendants' positive statements, between April 2, 2003, and May 5, 2003, the Company's ADR price alone increased over 16% -- from $36 to $43 per share.

16.      Then, between May 5 and May 19, 2003, with the price of AstraZeneca's stock artificially inflated, several AstraZeneca officers and directors sold over 62,000 shares of AstraZeneca for over £1.6 million in proceeds, including the Company's non-executive chairman who sold 50% of his AstraZeneca holdings:

| Name | Shares Sold | Price | Proceeds |
|------|------------|-------|----------|
| McKillop | 4,944 | £26.79 | £132,450 |
| Mogren | 3,810 | £26.79 | £101,956 |
| Symonds | 2,899 | £26.79 | £77,664 |
|  | 486 | £31.3 | £15,212 |
| Barnevick | 50,000 | SEK 339.05 | £1,311,819 |
| **Total** | **62,139** |  | **£1,639,101** |

17.    On July 15, 2003, the Company issued an additional press release entitled "Study shows new pill can treat life-threatening DVT without complications of current standard therapy," which stated in relevant part as follows:

A new tablet in development called ximelagatran[+] [Exanta[r]] can treat DVT [deep vein thrombosis] and prevent life-threatening consequences, suggests a study carried out on nearly 2,500 patients presented today at the International Society on Thrombosis and Haemostasis in Birmingham.

Between 30,000 and 100,000 people in the UK each year develop a Venous Thromboembolism [VTE, including both DVT and pulmonary embolism].[2,3,4] A recent pilot study showed that symptomless DVTs may occur in up to 10 per cent of long-haul airline travellers.

In the THRIVE[++] Treatment study, a fixed-dose of the tablet ximelagatran was as effective as the current complicated treatment combination of injected heparin [enoxaparin] plus warfarin tablets in preventing further DVTs or pulmonary emboli [PE]. Overall, the study resulted in a trend towards fewer incidences of major bleeding for patients on ximelagatran versus those on the treatment combination during the six-month study.

DVT treatment is designed to prevent the clot growing or breaking off. Fragments can travel through the blood supply and cause life-threatening obstruction of blood vessels in the lungs [a pulmonary embolism]. To avoid this potentially fatal outcome, patients are currently treated with blood thinning [anticoagulating] drugs such as warfarin. Clinical studies have shown that treatment over a period of up to six months after developing a clot is effective.

"This study raises the possibility of an effective new treatment that is simple to administer and does not require close anticoagulation monitoring," said Dr Gerry Dolan, Consultant Haematologist at the Queen's Medical Centre, Nottingham. "The current treatment regimes are effective, but are very complex to deliver. Ximelagatran is a tablet, rather than an injection. It appears to require no anticoagulation monitoring, no initial titration of treatment and seems to have no significant interactions with food or other medicines. These factors are a particular problem with injected heparins and warfarin, respectively."

*The results of the double-blind placebo-controlled THRIVE Treatment study show that ximelagatran - used at a fixed dose and without the requirement for on-going anti-coagulation monitoring - was equivalent to enoxaparin and dose-adjusted warfarin in preventing further DVT or pulmonary emboli [26 events out of 1,241 patients on ximelagatran vs 24 events in 1,249 patients on enoxaparin/warfarin].*

*The study also suggested that the risk of major bleeding - a complication of anti-coagulation treatment - showed a favourable trend for ximelagatran [14 on*

- 5 -

*ximelagatran vs 25 on enoxaparin/warfarin]. Mortality, similarly, was shown to have a favourable trend [28 deaths on ximelagatran vs 42 for enoxaparin/warfarin].*

The THRIVE Treatment study was designed to compare the efficacy of ximelagatran as an alternative to injectable enoxparin [given for up to 20 days] combined with dose-adjusted warfarin for the prevention of DVT and pulmonary emboli [collectively referred to as venous thromboembolism or VTE].

As in real life, the dose of warfarin was adjusted in each patient on an on-going basis to achieve a consistent and appropriate level of anticoagulation in their blood, which was measured in the usual way using INR. Ximelagatran does not require this kind of monitoring and is given at a fixed dose of 36 mg twice-a-day for VTE treatment in all patients. Treatment duration was six months. As part of the study protocol, liver enzymes were measured. The tests showed liver enzyme elevations in 9.6 per cent of patients on ximelagatran compared with 2.0 per cent of patients on the other treatment. These elevations decreased spontaneously whether ximelagatran treatment continued or stopped. As has been seen in previous studies, these elevations were typically transient and not associated with clinical symptoms.

Ximelagatran is not yet available but is expected to be launched over the coming year. The THRIVE Treatment study is one of a number of different studies which, together, are establishing the effectiveness and safety of ximelagatran and providing understanding of how doctors could use it in the future. It is being developed for the treatment and prevention of a range of conditions caused by blood clots, including treatment of DVT and stroke prevention in non-valvular atrial fibrillation. It is the first tablet in a new class of antithrombotic drugs known as Oral DTIs [Direct Thrombin Inhibitors]. It requires no routine anti-coagulation monitoring and does not interact with common medicines or foods.

18.    On July 28, 2003, Decisions Resources, Inc.[1] issued a press release entitled

"AstraZeneca's Exanta Will Surpass S2.4 Billion in Sales in 2012, According to a New Study From

Decision Resources" Decision Resource's press release stated in relevant part as follows:

Decision Resources, Inc., one of the world's leading research and advisory firms focusing on pharmaceutical and health care issues, forecasts that AstraZeneca's Exanta will revolutionize the prevention of stroke in cases of atrial fibrillation. *Sales of Exanta will reach more than $1.5 billion in 2007 and surpass $2.4 billion in 2012.*

_____

[1]    Decisions Resources, Inc. lists Astrazeneca as a client on its website http://www.dresources.com/aboutus.asp (viewed 10/20/04).

Exanta offers many advantages over currently marketed oral anticoagulants like Bristol-Myers Squibb's Coumadin--the current anticoagulant of choice for preventing stroke in atrial fibrillation. "Exanta can be given as a fixed oral dose, without the need for titration or regular anticoagulant monitoring; it also has a superior food- and drug- interaction profiles," said Ruth Brown, Ph.D., analyst at Decision Resources. "These advantages will not only allow Exanta to erode Coumadin's market share, they will also allow the extension of anticoagulant therapy to a much wider patient population, including the elderly, who are often excluded from such treatment regimens because of physician concerns about Coumadin's safety."

19.    On September 1, 2003, the Company issued a press release entitled "Phase II study demonstrates promise for Exanta [ximelagatran] in reducing major cardiovascular events following myocardial infarction [MI]," which stated in relevant part as follows:

ESTEEM [see Note A] study indicates potential for Exanta in new cardiovascular indication.

Data from a phase II dose-guiding study, ESTEEM [see Note A], indicate that oral Exanta[tm] [ximelagatran], the first in a new class of oral direct thrombin inhibitors [oral DTIs], may provide significant additional benefits compared to the current treatment, aspirin, in prevention of major cardiovascular events in patients following an acute myocardial infarction [heart attack]. This is the first time an oral DTI has been evaluated in the long-term treatment of patients following heart attack who are at high risk of arterial thrombotic events, such as further heart attack, stroke or cardiovascular death.

Results from ESTEEM show that oral Exanta significantly reduces the risk of death, recurrent heart attack or attacks of severe chest pain from 16.3% to 12.7% [all dose groups combined] during six months treatment in combination with aspirin, equating to a reduced risk of 24% [hazard ratio 0.76; p=0.036] compared with aspirin alone plus placebo.

*"The results of this study are very exciting as they show the first proof of efficacy for Exanta in this new indication, and demonstrate that this new concept holds great promise for better protection against recurrent heart attacks in patients at risk of further cardiovascular events", comments Professor Lars Wallentin, Professor of Cardiology at Uppsala University Hospital, Sweden, and Lead Investigator for the ESTEEM study.*

ESTEEM, a phase II multi-centre, multinational randomised, placebo-controlled, double-blind dose-guiding study, involved randomisation of 1883 patients within 14 days of a heart attack to six months treatment twice daily of either oral Exanta 24, 36, 48 or 60 mg or placebo. All patients received 160mg aspirin once daily.

- 7 -

*Overall, a favourable safety profile was seen for Exanta in terms of bleeding and general adverse events. There was no significant difference in major bleeding events between the Exanta and placebo treatment groups [1.8% Exanta vs 0.9% placebo]. Total bleeding [major and minor] was higher in the Exanta group, but comparable to rates seen in recent trials of long-term warfarin or other agents, and increased in a dose-related manner.*

Laboratory blood tests in the study showed an increased incidence of liver enzyme elevations [see Note B] in patients receiving Exanta, compared with those receiving placebo, as observed in phase III studies. Elevated liver enzymes were seen in 6.5% of patients at the lowest dose, 24mg, while elevations were seen in 12.2 - 13% of patients at the higher doses. An incidence of elevated bilirubin levels > 2XULN combined with ALAT > 3XULN occurred in 0.6% of patients in the Exanta group, compared with 0.2% of patients in the placebo group. As seen in phase III Exanta studies, these ALAT elevations decreased towards baseline with treatment continuation or discontinuation and were not typically associated with specific clinical symptoms. These findings are under evaluation together with safety results from the full Exanta clinical study programme in order to establish the overall benefit-risk profile for the product.

*Chronic phase III studies to date have demonstrated a positive benefit-risk profile for Exanta overall.* The first full presentation of the phase III SPORTIF III [see Note C] study will take place at the ESC Congress 2003 on Tuesday 2 September. *Preliminary results from the SPORTIF III study reported at the American College of Cardiology [ACC] congress earlier this year demonstrated that Exanta has the potential to be an effective and convenient replacement for warfarin in the prevention of stroke and systemic embolic events [SEE] in patients with atrial fibrillation [AF], without the warfarin limitations of drug interactions, the need for coagulation monitoring and dose titration.* SPORTIF III is a critical study for Exanta in the important stroke prevention in AF indication due to the potential for Exanta to meet an unmet medical need - AF is a factor behind 15% of all strokes [1].

*"The promising efficacy results from ESTEEM provide a strong foundation for possible future development of Exanta in this and other arterial indications in which there is a high unmet medical need", says Dr Hamish Cameron, Vice President, Head of Exanta, AstraZeneca. "We will now focus on incorporating the efficacy and safety results from ESTEEM alongside those seen in the extensive phase III clinical programme to date, to establish the overall benefit-risk profile for Exanta in the key indications under investigation."*

Exanta has completed phase III studies in a number of indications and around 30,000 patients have been enrolled in the Exanta clinical trial programme to date. Exanta is the first oral anticoagulant to reach late stage clinical trials since the development of warfarin 60 years ago. Regulatory submission for the major indications of stroke prevention in atrial fibrillation and treatment and long-term prevention of VTE remain on track for late 2003.

20.    On September 2, 2003, the Company issued a press release entitled "Largest-ever stroke prevention study shows new tablet prevents strokes in patients with atrial fibrillation," which stated in relevant part as follows:

*Latest results from a study of 3,407 patients with non-valvular atrial fibrillation [AF, an irregular heart rhythm] show that ximelagatran is as effective in preventing strokes as warfarin, the current gold standard treatment.*[1] Moreover, this was seen across all groups of patients studied, including the elderly population. "These findings will be warmly welcomed, particular regarding older patients" commented Professor Gary Ford, Director of the Freeman Hospital Stroke Service, Newcastle upon Tyne and Principal Investigator for the study in the UK. "Although doctors recognise the benefits of warfarin, they are often concerned about the risks of bleeding - especially in older patients who are at very high risk of stroke. This often results in a reluctance to prescribe warfarin."

Stroke is a devastating yet often preventable condition. The risk of having a stroke is increased with AF. A patient with AF who has an ischaemic stroke [a stroke caused by blood clots blocking blood flow to the brain] is also twice as likely to die as a result of the stroke than someone who does not suffer from the condition. Therefore, many patients at risk of stroke are currently treated with warfarin, which has been shown to reduce this risk by 68%.

There are problems associated with warfarin, however. It interacts with some common foods and medicines and requires close dose monitoring. A recent survey revealed that 72% of GPs would not initiate warfarin for an aspirin-treated AF patient at risk of stroke due to concerns regarding the dangers of poorly controlled warfarin or the risks of bleeding. The total rate of bleeding was found to be lower for ximelagatran than warfarin in the new study [p=0.007].

*Exanta[r] [ximelagatran], the first in a new class of oral direct thrombin inhibitors [DTIs], was found to compare favourably with warfarin for the prevention of stroke and blood clots at its fixed dose, 36mg twice daily [40 ximelagatran events versus 56 warfarin events]. The study shows that ximelagatran can be expected to be an effective, convenient replacement to warfarin.*

*"A new treatment that is as effective as warfarin for the reduction of stroke, whilst avoiding the need for long-term dose monitoring and without the major drug and food interactions associated with warfarin, is a major therapeutic advance," said Professor Gary Ford. "Ximelagatran, when licenced, could potentially transform our approach to the management of stroke prevention in AF."*

Patients were treated for an average of 17 months, allowing safety to be closely assessed. The combined rates of all-cause mortality [i.e. death for any reason], primary events [stroke and systemic embolic events] and major bleeding was statistically lower in patients treated with ximelagatran [104 events or 4.6%]

compared with those treated with warfarin [143 events or 6.1%] [p=0.022]. Standard lab tests measuring liver enzymes were included in the study design. Transient elevations in the levels of alanine aminotransferase [ALT] were observed in 6.3 per cent of patients receiving Exanta and an incidence of elevated bilirubin > 2XULN [upper limit of normal] combined with ALT > 3xULN was seen in 0.4 per cent of Exanta patients compared with 0.1 per cent of warfarin patients. As in other Exanta phase III studies, these ALT elevations decreased towards baseline with treatment continuation or discontinuation and were not typically associated with specific clinical symptoms.

Furthermore, data showing benefits with ximelagatran for patients who have suffered a heart attack was also been presented at the ESC Congress this week. The study found that ximelagatran in combination with aspirin is more effective to aspirin alone in preventing further major cardiovascular events [death, recurrent heart attack or severe ischaemia] in patients enrolled within 14 days of a heart attack. *The findings suggest ximelagatran has a real potential to be an effective future treatment for this group of patients who, without treatment, are frequently likely to suffer another heart attack, stroke, or similar devastating condition. The ESTEEM trial also contributes to the growing evidence of ximelagatran's favourable benefit-risk profile.* Liver enzyme [ALT] elevations were also seen in this trial, but as in other studies, these ALT elevations decreased towards baseline with treatment continuation or discontinuation and were not typically associated with specific clinical symptoms. Elevated liver enzymes were seen in 6.5% of patients at the 24mg bd dose, with an incidence of 12.2 - 13% of patients at the higher doses [up to 60mg bd].

21.    On September 2, 2003, the Company issued an additional press release entitled

"Latest data from largest-ever stroke prevention study in atrial fibrillation shows potential for Exanta

[ximelagatran] in major indication," which stated in relevant part:

> *Latest data from the full presentation of the SPORTIF III[1] study shows a net clinical benefit for Exanta[TM] [ximelagatran], the first in a new class of oral direct thrombin inhibitors [oral DTIs], compared with the current standard treatment, dose-adjusted warfarin, in preventing stroke and systemic embolic events [SEE] in patients with atrial fibrillation [AF].*
>
> In an assessment of the combined rates of deaths, primary events and major bleeding while on treatment, a statistically significant 104 [4.6%] events were seen with Exanta compared with 143 [6.1%] with warfarin [p=0.022]. This important finding illustrates that patients can benefit from an effective treatment to prevent morbidity and mortality, while also avoiding the limitations that are associated with currently available treatments.
>
> *The primary endpoint of SPORTIF III was met in demonstrating that fixed dose twice daily 36mg oral Exanta compares favourably with well-controlled dose-adjusted warfarin in prevention of stroke and SEE in patients with AF* [40 Exanta

vs 56 warfarin events, ITT population]. *These efficacy results were also consistently reflected across all sub-populations and secondary composite endpoints, demonstrating the potential for Exanta as an effective and convenient replacement for warfarin in this indication, particularly in light of the high level of warfarin control in the study* [average INR 2.5].

"These results offer real hope for people with atrial fibrillation, who are at five times greater risk of stroke. Half of people with atrial fibrillation who are at risk of stroke go untreated due to the limitations of current therapies, such as warfarin which, although effective, requires coagulation monitoring, dose titration and dietary restrictions", comments Professor Bertil Olsson, co-lead investigator of SPORTIF III and Professor of Cardiology, University Hospital, Lund, Sweden. "Therefore, a new drug, such as ximelagatran, represents a distinct innovation in anticoagulant therapy that could fill this treatment gap and help to reduce the burden which stroke currently places on patients and health services all over the world."

SPORTIF III, a multi-national, randomised, open-label parallel-group study with blinded event assessment, involved 3407 patients from 259 centres across Europe, Australia and Asia. Patients were treated for an average of 17 months, providing important safety data to support the emerging benefit-risk profile for Exanta.

Despite no coagulation monitoring or dose titration in the Exanta group, neither stroke nor bleeding rates were increased relative to well-controlled warfarin. Furthermore, the combined rate of major and minor [total] bleedings was significantly lower for Exanta compared with warfarin [p=0.007].

Transient elevations in the levels of liver enzymes [alanine aminotransferase, ALAT] were observed in 6.3% of patients receiving Exanta and an incidence of elevated bilirubin > 2x ULN combined with ALAT > 3x ULN was seen in 0.4% of Exanta patients compared with 0.1% of warfarin patients. As in other Exanta phase III studies to date, these ALAT elevations decreased towards baseline with treatment continuation or discontinuation and were not typically associated with specific clinical symptoms. These findings are under evaluation together with all safety results from the full Exanta clinical study programme in order to establish the overall benefit-risk profile for the product.

*"Data reported from SPORTIF III have underlined the overall clinical benefit and potential of Exanta in this important area of unmet medical need", comments Dr Hamish Cameron, Vice President, Head of Exanta, AstraZeneca. "The results of SPORTIF III enhance the emerging benefit-risk profile for Exanta and will be complemented by the presentation of the second major study in this indication, SPORTIF V, at the American Heart Association [AHA] meeting later this year."*

Exanta is also in phase III investigation in several indications for venous thrombosis and is the first oral anticoagulant to reach late stage clinical development in 60 years since the development of warfarin. The potential of Exanta in the treatment of arterial thrombosis has also been highlighted in the phase II ESTEEM study, presented at the

ESC Congress 2003 yesterday. ESTEEM is the first study to evaluate an oral DTI in long-term treatment for patients at high risk of arterial disease and provides a strong foundation for possible future development for Exanta in arterial indications.

22.    On October 2, 2003, the Company presented its Annual Business Review with several

officers making very positive statements about the status of the Exanta launch:

- *McKillop:* "The market opportunities for...Exanta...is tremendous and the expected timing of...launches in the U.S. will keep our business growing nicely in the mid-term. We expect to achieve great things with both of these brands."

- *McKillop:* "We've also created an organization structured for success by creating powerful, focused brand teams that have replaced organizationally structures that were based on function. We are focused on keeping what's creating value and reallocating resources to where they can be most effective. We believe this focus will enable us to continue our successes with products...while at the same time, successfully launching our new brands...Exanta"

- *Nicklasson:* "the third wave of our portfolio transformation is nearing completion. An enormously comprehensive Phase III phase mini literacy (ph) program with Exanta has reached it's conclusion and major regulatory size (ph) are soon to be submitted to the FDA, European agencies and others....Major regulatory submissions are still to come later this year and further on into next year. Of particular importance is the filing of Exanta in the U.S. and Europe for VTE prevention and treatment as well as stroke prevention in atrial fibrillation."

23.    At the Annual Business Review, Hamish Cameron, AstraZeneca's Vice President of

Exanta provided a specific update on Exanta's progress, stating in relevant part as follows:

I'm now going to update you on Exanta, a new entrance to the high potential antithrombotic market, which globally is currently valued at 10.8 billion and growing at 14%. Now, you've had a lot of recent news on Exanta, so today I want to step back and have a look at a few key issues at a grand level - the unmet need, the benefit risk data, including a review of liver findings, our future plans and the value that Exanta will bring to patients, doctors and society.

*        *        *

Our strategy is to introduce this new approach, to replace Warfarin and then expand use into new indications in patients, becoming the new gold standard in anticoagulation. And as you can see on this slide, our initial development is focused on a number of foundation indications. The desired profile was in contrast to Warfarin - to develop an oral anticoagulant without a narrow therapeutic index, allowing fixed dosing without the need for regular coagulation monitoring, further

supported by a plan black (ph) of troublesome drug and food interactions. And all of this had to be achieved with an acceptable bleeding profile.

*Today, after a clinical trial program with 30,000 patients, this profile has been delivered.*

*Through a series of large, mainly outcome trials, we've shown the target profile come to life in patients.*

\*       \*       \*

The common profile of Exanta has been strengthened by the results of SPORTIF III, the first pivotal trial of stroke prevention in AS patients. *SPORTIF III achieved the planned non-inferiority versus Warfarin.* And these results will be combined with SPORTIF V as the basis for the AS claim. SPORTIF V will be a late breaking trial at the American heart meeting next month. The SPORTIF III results showed consistency across all subgroups, and were associated with an acceptable bleeding profile, importantly across all age groups. Indeed, there was a significantly lower number of major and minor bleeds combined, with Exanta, compared with Warfarin.

And as I said earlier, this is Warfarin on its very best behavior with tight control, frequent monitoring, and close medical attention. We're now considering studies against Warfarin in what might be termed "the real world."

*Here they expect the benefits of Exanta to be magnified as the realities of clinical practice take us beyond the controlled world of clinical trials.*

\*       \*       \*

*With its rapid onset of effect, chronic all dosing now approaching five years. A sixth dose without coagulation monitoring and with an acceptable bleeding profile, our target has been achieved.*

\*       \*       \*

I can confirm today that the MDA (ph) for Exanta will include the orthopedic, secondary prevention and atrial fibrillation indications and will be submitted at the end of this year. We plan to discuss with FDA what additional information is needed to support the approval of VTE treatment in the US.

\*       \*       \*

Now any new drug is the first in terms of benefit and risk. And having reviewed efficacy and bleeding, I now want to turn to the unexpected results, the liver findings, in the clinical program.

- 13 -

Now, pre-clinical work didn't predict any liver issue. In the early surgical studies with 11-day dosing, didn't show any liver changes with Exanta. Just the well recognized enzyme elevations that you see with heprines (ph).

In longer termed studies of Exanta beyond 30 days, we've recorded raised liver enzymes. *Let me be clear out the outset. We believe Exanta has a positive benefit risk profile. And we'll be presenting this case in our various regulatory submissions.*

                            *        *        *

We expect some form of liver function testing in Exanta labeling. Although for how long will be a matter for debate. *It should be no comparison with the complex and lifelong requirement for coagulation monitoring and dose titration in patients taking Warfarin.*

As regards mechanism, you rarely identify the specific cause of a drug-related hepato-toxicity (ph) because most cases seem to have a multi-factorial basis.

*For Exanta the enzyme elevations occur around two months. Here's the timing of observations from the SPORTIF III study. They're typically transient, not associated with specific symptoms and return to normal or baseline in respective of whether patients stop or continue the drug.*

*Now this reversibility has been of interest to the experts we've consulted, and the phenomenon is highlighted here with individual patient data from SPORTIF III.* Against the background of our often quite striking elevations linked to other causes -- for example, the two highest peaks on the lefthand side at six months were associate with colussititus (ph) and acute severe heart failure.

*Against that type of background, you can see the predictable Exanta patterns have increased between 30 and 90 days, followed by a return towards normal, whether or not patients continued the drug.*

When you look at the Kaplan Meyer plots of raised (inaudible) out of each of the main studies, you see the background incidents on the comparitor, they are Warfarin and SPORTIF III. And the increase on Exanta, starting around two to three months.

Indeed, once you're beyond this period, and certainly during the first year, the rate of new cases flattens right off. Here's the similar picture for Five (ph) three and the shorter Five (ph) treatment study.

Now symptoms have been seen uncommonly in association with raised enzymes, but we have to be very careful how we interpret them. To be in a trial increases the chances of a symptom being reported as a side effect.

Many underlying illnesses cause liver-type symptoms which you can see are fairly non-specific. And if you're known to have a finding of raised enzymes, then there's a greater chance any symptom you have will be linked to it.

And you see this effect when you compare SPORTIF III with its open design regarding symptom reporting, compared with the double-blind studies where there's no difference between the treatment groups.

If you look at more specifically the symptoms and signs, for example jaundice. There were four reports amongst Exanta patients in SPORTIF III. In each case, another cause was present, such as cancer or prolithsititus (ph).

So we have to interpret data on symptoms with caution. Now another way to assess possible liver injury, and one I know that's been of interest to regulators, is to look for the association of enzyme elevation with raised bilirubin. In our trials we've seen isolated raised bilirubin reported equally across Exanta and comparative groups, which really reflects the background disease or clinical state. So again we've standardized our way of presenting the data.

We're describing cases of elevated bilirubin greater than two times upper limit occurring in association with any greater than three times elevations in ALAT (ph).

And by looking at cases of raised bilirubin occurring within one month after raised ALAT (ph), we can begin to tease out cases potentially of interest from the background noise. Here are the figures for raised bilirubin and ALAT (ph) using this definition across the reported trials.

This coincident elevation of enzymes and bilirubin is often referred to as Hye's (ph) law or Hye's (ph) rule. And it's been suggested as a way of quantifying the risk of serious liver damage. The Hye (ph) in question is Dr. Hyman Zimmerman, who wrote the definitive textbook on hepatotoxicity.

He retrospectively examined drug induced liver damage and tried to look for predictive features. He concluded in cases of hepatis cellular damage, the coexistence of raise enzymes and obvious clinical jaundice were bad prognostic signs.

Today, however, Hye's law (ph) is usually described as a numerical formula, the coexistence of raised ALAT (ph) times three with raised bilirubin times 1.5 or greater than times two. *The point is, clinical jaundice isn't usually seen at these bilirubin levels.*

*And so this isn't really what Dr. Zimmerman was describing. Indeed, the liver experts tell us that there's little prospective evidence to confirm this numerical signal in drug development as an accurate predictor of outcome.*

Having said that, we're reporting the figures to you and the clinical regulatory community, and we'll be discussing these findings in detail in our submission. We

- 15 -

take this whole matter seriously. We've reported all information to regulatory authorities, and we've consulted extensively with liver experts across the world.

We've a detailed program looking at mechanisms for the liver enzyme effects, and we're using the liver as a clinical screening factor in our future all DTI drug development.

***To support Exanta's launch, we've developed patient risk management approaches.*** A formal part of our regulatory submission here in the U.S. For our future trials, marketing efforts and brand communication will all encompass the same key principles for prescribers and patients.

We also expect to engage with the authorities over possible post-marketing surveillance. We're planning post submission clinical trial activities to provide launch support, as well as putting in place the early work for Exanta's full life cycle development.

Having invented the first all DTI compound, we're taking a bold step to replace Warfarin after half a century. We intend to develop and maintain leadership of all aspects of this class. And we start with Exanta.

There are many reasons why there's so much interest in the potential value of Exanta. As you can see on this slide, managing anti-coagulation with Warfarin is a complex and costly process.

***And this isn't the liver algorithm triggered in a few percent of patients. This is the monitoring for Warfarin used in every patient.*** Deviation from the therapeutic target range is an important cause of treatment failure in clinical practice.

And … our values are difficult to monitor and maintain within the narrow therapeutic index of two to three. Failure to do so is directly linked to bad outcomes. This difficulty is exemplified here.

*    *    *

The next phase, including the regulatory review, will determine Exanta's future. ***We're*** proud of what we've achieved and ***confident we can deliver this innovative therapy as the foundation of a new class.***

*    *    *

The one thing I would like to sort of leave in your minds is that ***Exanta (ph) is a product who's benefit risk should be judged with your brain***, not your calculators.

***The obsession with numerical formuling is something that's been written about and obviously we cover it in our regulatory submissions. But remember the burden of Warfarin. Remember all those patients who aren't currently treated, who literally die because of that fact.***

- 16 -

*Then bring to the table the Warfarin comparative data that you've seen displayed repeatedly with good efficacy, good bleeding profiles. Then you begin to put the liver data in context. So I would just repeat the statement: we're very confident of a positive benefit risk profile for Exanta.*

\*        \*        \*

The bigger thing about Hye's law (ph) and whether we've got enough to estimate this, that and the other. I'd just repeat my point about brains and calculators. This is a judgment call. *We believe we have enough data to submit and enough data on which to make the compelling benefit risk case.*

Sure, there's an issue with liver enzymes. *But through the risk management approach and the proper labeling of the product, we think -- and the doctors we've worked with and the liver experts we've consulted -- believe it is manageable.*

So, I've met lots of liver experts and most of them work for Hye Zimmerman (ph). And Hye Zimmerman (ph) in his final words -- he died a few years ago -- he regretted the way in which in his "law" had been corrupted into this numerical formula.

And if you actually think about what he originally wrote about and did it was a more end of bed (ph) clinical judgment. So, I hope we'll be able to present a very case. We've followed up all the patients. You saw the recovery data on SPORTIF III. *We've tracked them all with little green dots at the end of the line that will make a very good benefit risk case and a very solid safety base for FDA.*

24.    The Company's stock traded up on very high volume – from $40.63 to $45.30 - on October 3, 2003, following the Annual Business Review. As this news was absorbed into the market, by October 30, 2003, the Company's stock price had reached $49 per share.

25.    On October 29, 2003, the Company issued a press release entitled "Two Studies Published in the NEJM Report Effects of AstraZeneca's Investigational Oral Anticoagulant EXANTA(TM) (ximelagatran) on Reducing Risk of Blood Clots," which stated in relevant part as follows:

Results of a Phase III clinical trial of AstraZeneca's investigational oral anticoagulant EXANTA(TM) (ximelagatran) showed that treatment with EXANTA (36 mg BID) reduced the risk of blood clots by 26 percent after total knee replacement (TKR) surgery compared with dose-adjusted warfarin to a target INR of 2.5. Additionally, results from a second Phase III clinical trial in patients who had completed a conventional six-month course of treatment for blood clots showed that

- 17 -

treatment with EXANTA for an additional 18 months resulted in about an 84 percent relative risk reduction of developing recurrent events compared with placebo. Results of these studies, EXULT A (EXanta Used to Lessen Thrombosis) and THRIVE III (oral direct THRombin Inhibitor ximelagatran for Venous thromboEmbolism), were published today in the October 30th issue of The New England Journal of Medicine.

The objective of EXULT A was to optimize the dosage of EXANTA and compare its efficacy and safety with those of warfarin for the prevention of deep vein thrombosis (DVT), pulmonary embolism (PE) and all cause mortality in TKR patients. Results showed a 20.3 percent incidence with EXANTA 36 mg BID (128 events in 629 evaluable patients) vs. a 27.6 percent incidence with warfarin (168 events in 608 evaluable patients) in total DVT and/or PE and/or all-cause mortality (statistically significant at p=0.003). The incidence of the primary endpoint with EXANTA 24 mg BID was 24.9 percent (153 events in 614 evaluable patients; not statistically significant at p=0.28 vs. warfarin).

EXULT A was a multicenter, randomized, double-blind, double-dummy trial that included 2,301 patients undergoing TKR surgery at 116 trial sites in five countries. Patients were given an oral, fixed dose of EXANTA 24 mg (n=762) or 36 mg (n=775) BID initiated the morning after surgery or dose-adjusted warfarin (n=764) at a target INR of 2.5 initiated the evening of the day of surgery. Study treatment was continued for 7-12 days. Incidence of total DVT (distal and proximal) was confirmed by bilateral venography on the final treatment day; symptomatic DVT or PE was confirmed by other objective means. Endpoint assessment of DVT, PE, or cause of death and of bleeding events was determined by an independent central adjudication committee.

The incidence of major bleeding on treatment was 0.8 percent (6 events in 757 patients) on EXANTA 24 mg, 0.8 percent (6 events in 769 patients) on EXANTA 36 mg, and 0.7 percent (5 events in 759 patients) on warfarin. Any (major and/or minor) bleeding on treatment was 4.8 percent and 5.3 percent for EXANTA 24 mg and 36 mg, respectively, and 4.5 percent for warfarin. None of these differences were statistically significant.

THRIVE III, the second Phase III study published in NEJM, evaluated the efficacy, safety and tolerability of EXANTA for extended secondary prevention of DVT and PE, following six months of standard anticoagulation. Results showed that in patients treated with a fixed dose of EXANTA 24 mg, the risk of developing a blood clot was approximately 84 percent lower than in those receiving placebo. Specifically, the estimated cumulative risk of a recurring DVT or PE during 18 months of treatment was 12.6 percent for placebo vs. 2.8 percent for EXANTA (p<0.001).

THRIVE III was an international, multicenter, double-blind trial with 1,223 patients with DVT or PE who had received standard anticoagulation treatment for six months. Patients were randomized to long-term secondary prevention with either oral

EXANTA 24 mg BID (n=612) or placebo (n=611) for another 18 months, without coagulation monitoring.

In THRIVE III, six patients on EXANTA experienced major bleeding events compared with five on placebo during the 18-month period. There were 134 and 111 total (major and/or minor) bleeding events on EXANTA and placebo, respectively. Increases to greater than 3 times the upper limits of normal in the liver enzyme alanine aminotransferase (ALT) were observed with EXANTA compared to placebo (estimated cumulative risk at 18 months of 6.4 percent vs. 1.2 percent). These enzyme changes occurred within the first six months of treatment, were associated with no specific clinical symptoms, and decreased with continuation or discontinuation of drug.

26.    On November 11, 2003, the Company issued a press release entitled "New Landmark Study Confirms Potential for Exanta [ximelagatran] in Prevention of Stroke in Atrial Fibrillation," which stated in relevant part as follows:

American Heart Association Scientific Sessions 2003, ORLANDO, Florida, November 11 /PRNewswire/ -- *Results from the SPORTIF V[1][a] study, presented today, support the potential for Exanta[TM] [ximelagatran], the first oral treatment in a new class of direct thrombin inhibitors [DTIs], to be an effective and predictable replacement for warfarin in the prevention of stroke and systemic embolic events [SEE] in patients with atrial fibrillation [AF], without the limitations of warfarin treatment.* SPORTIF V, together with the recently presented SPORTIF III[2][b] study, is part of the largest stroke prevention in atrial fibrillation study programme to date, involving 7329 patients. These studies will now be submitted to regulatory authorities in the US and Europe as part of the regulatory application for Exanta in this indication.

SPORTIF V was designed as a non-inferiority[c] study to compare oral Exanta with the current standard treatment, dose-adjusted warfarin in preventing stroke and systemic embolic events [SEE] in atrial fibrillation, and the results support the findings of the SPORTIF III study. *The primary efficacy endpoint was met, showing that fixed dose twice daily 36mg oral Exanta is non-inferior to dose-adjusted warfarin in preventing stroke and SEE: 51 Exanta patients with events [1.6%/yr] vs 37 for warfarin [1.2%/yr], confirming non-inferiority based on the same criteria used in the SPORTIF III study.* Importantly, this result was seen despite excellent control of warfarin treatment in the study: patients were within the INR[d] range of 2.0-3.0 for 68% of time. *When the results from both studies are pooled, 91 patients with events were seen for Exanta compared with 93 for warfarin [1.6%/yr vs 1.6%/yr], supporting the efficacy of Exanta in prevention of strokes and thromboembolic events in patients with atrial fibrillation.*

"If a person can take warfarin and take it well, it is highly effective at preventing strokes. It is a real problem, however, to deliver the drug consistently to patients,

particularly the elderly, as it requires close coagulation monitoring and dose titration", comments Dr Jonathan L. Halperin, Professor of Medicine at the Mount Sinai School of Medicine, New York, and SPORTIF V Lead Investigator. "The risk of stroke, as well as the difficulties of using warfarin - particularly the increased risk of bleeding - increases with age, leaving too many patients under-treated. Ximelagatran represents an exciting new approach to anticoagulation, as the SPORTIF V results show. We may be able to offer our patients a much-needed, consistently efficacious alternative to warfarin treatment that does not have the limitations inherent in coagulation monitoring or dose titration."

Patients were treated for an average of 20 months in SPORTIF V, providing further long-term data to support the emerging benefit-risk profile for Exanta. Despite no coagulation monitoring or dose titration in the Exanta group, a lower number of patients in SPORTIF V experienced major bleeding [2.4% Exanta vs 3.1% warfarin; p=n.s.]. Warfarin was well controlled with careful ongoing coagulation monitoring, dose adjustment and dose titration, yet Exanta demonstrated significantly less total [major and/or minor] bleeding rates than well-controlled warfarin [37% Exanta vs 47% warfarin p<0.0001] with no significant increase in event rate.

An elevation of liver enzymes [ALAT >3XULN] was observed in 6% of patients treated with Exanta in SPORTIF V, a consistent level to that seen in other long-term Exanta studies. An incidence of elevated bilirubin > 2XULN following ALAT > 3XULN was seen in 9 Exanta patients vs 1 warfarin patient. When assessed alongside SPORTIF III as pooled data, the overall incidence of liver enzymes for Exanta in the SPORTIF programme is 6.1%, compared with 0.8% of patients in the warfarin group. These elevations are typically transient [occurring within first 2-6 months], decrease towards normal with treatment continuation or discontinuation and are not associated with specific clinical symptoms in the SPORTIF programme overall.

Overall, a statistically significant net clinical benefit is seen for Exanta from the pooled data of both the SPORTIF V and SPORTIF III studies. In an assessment of the combined rates of deaths, primary events and major bleeding while on treatment in both studies, 5.2% events were seen with Exanta compared with 6.2% with warfarin [p=0.038]. This finding demonstrates that patients can benefit from a predictable and effective treatment to prevent morbidity and mortality, whilst avoiding the limitations that are associated with warfarin.

*"SPORTIF V supports the overall clinical benefit of Exanta in this important area of unmet medical need", comments Dr Hamish Cameron, Vice President, Head of Exanta, AstraZeneca. "The SPORTIF programme will represent the key element of our regulatory submissions supporting the use of the drug in the prevention of stroke and SEE in patients with atrial fibrillation. The submission, which is planned for the end of the year, will also include a full evaluation of Exanta's risk benefit profile based on the extensive data we have generated from clinical studies in more than 30,000 patients."*

Stroke is a leading cause of death in adults in industrialised countries, with five million fatal events per year[3]. Atrial fibrillation has been found to increase the risk of stroke fivefold, accounting for around 15% of all strokes[4][5]. Despite studies showing that the risk of stroke can be reduced by 62% in patients taking oral anticoagulant therapy[5], around 50% of eligible patients do not receive optimal treatment[6].

Exanta is the first oral anticoagulant to reach late stage clinical development in almost 60 years, and has been the subject of the most extensive clinical study programme to date, involving around 30,000 patients. Regulatory submissions for Exanta in the prevention of stroke in patients with atrial fibrillation indication will take place in US and Europe by the end of 2003.

27.    On November 12, 2003, the Company issued a press release entitled "AstraZeneca:

New tablet hailed as major breakthrough in the prevention of strokes," which stated in relevant part

as follows:

A new tablet that will revolutionise treatment for up to half a million people in the UK at risk of a stroke from a blood clot has been welcomed by doctors as the most important therapeutic advance in stroke prevention for 60 years.

***Data presented today, showed that the new tablet, called Exanta [ximelagatran], is as effective as warfarin at reducing strokes from blood clots in people with a common irregular heart rhythm called atrial fibrillation [AF]. Ximelagatran, the first direct thrombin inhibitor, has a consistent and reliable effect, therefore does not need time-consuming and resource-intensive anticoagulation monitoring to ensure patients achieve safe levels of anticoagulation.*** In addition, the same dose can be given to all patients and unlike warfarin, the effects of ximelagatran are not significantly influenced by food and alcohol and it has a low potential for interactions with other drugs. Today's data from the North American arm of the SPORTIF programme [SPORTIF V] combined with results from the rest of the world [SPORTIF III] arm - including a total of 7329 patients - will complete the regulatory submission for the prevention of stroke in patients with AF indication for ximelagatran.

Until now, doctors treating patients at risk of stroke from a blood clot have had to rely on the blood thinner warfarin, an effective but often unstable drug, which requires frequent clinic attendance to keep the drug at safe levels. Warfarin also has complicated dosing requiring frequent adjustment and should not be taken with certain foods, alcohol and common medicines, such as pain killers, antibiotics and statins. However, because well-controlled warfarin is highly effective and reduces the risk of stroke caused by blood clots by 68% compared with placebo, it is the current gold standard treatment, compared with aspirin at 21%.

- 21 -

Professor Gary Ford, Consultant Stroke Physician the Freeman Hospital Stroke Service, Newcastle upon Tyne, and Principal Investigator in the SPORTIF programme in the UK said "These results show that ximelagatran is as effective in preventing stroke as extremely well-controlled warfarin and avoids the need for long-term monitoring. Ximelagatran, when licenced, could potentially transform our approach to the management of stroke prevention in atrial fibrillation, particularly in those patients where monitoring is difficult and where there are concerns about interactions of warfarin with other drugs, or anticoagulation responses to warfarin are highly variable."

*     *     *

The results of SPORTIF V a randomised, double-blind, double-dummy study involving 3922 patients with non-valvular atrial fibrillation across 409 North American centres show that a fixed, oral, twice-daily dose of ximelagatran 36 mg *is as effective as dose-adjusted warfarin at preventing strokes* [51 vs 37 events, $p<0.13$ - a non-significant difference]. *Furthermore, ximelagatran was associated with significantly fewer major and minor bleeding events compared with warfarin* [37% vs 47%; $p<0.0001$]. By the design of the study, patients receiving warfarin were extremely well-controlled due to close monitoring of their INR* value and resultant dose adjustment in order to maintain values within the ideal range of 2.0-3.0. However, in routine clinical practice, the proportion of time spent outside the target INR range is between 38-61%, thereby increasing the relative bleeding risk.

Liver enzyme [ALT] elevations were also seen in this trial, but as in other studies, these ALT elevations decreased towards baseline with treatment continuation or discontinuation and were not typically associated with specific clinical symptoms. Elevated liver enzymes were seen in 6% of patients at the 36 mg twice-daily dose compared with 0.8% of patients in the warfarin group.

*AstraZeneca is committed to the extensive clinical trial programme for Exanta [ximelagatran] and further studies have shown that the tablet is effective for the treatment and prevention of venous thromboembolism [VTE] following deep vein thrombosis* [DVT]. Ximelagatran has been subject to the most extensive clinical study programme in anticoagulation to date, involving around 30,000 patients in over 25 countries worldwide.

28.     On November 20, 2003, the Company issued a press release entitled "Lancet Publishes Results of Largest Stroke Prevention Trial; AstraZeneca's Investigational Oral Anticoagulant Studied as Alternative to Well-Controlled Warfarin for Stroke Prevention in Atrial Fibrillation," which stated in relevant part as follows:

Results of the largest stroke prevention trial ever conducted comparing AstraZeneca's investigational oral anticoagulant EXANTA(TM) (ximelagatran) to

warfarin in patients with nonvalvular atrial fibrillation (NVAF) were published today in The Lancet.

SPORTIF III (Stroke Prevention using an Oral Thrombin Inhibitor in atrial Fibrillation) was an open-label, randomized, non-inferiority trial. In the intent-to-treat analysis, patients treated with EXANTA (n=1,704) had 40 strokes and systemic embolic events compared to 56 events in patients treated with warfarin (n=1,703). This difference was not statistically different and, thus, this non-inferiority trial achieved its primary endpoint. An analysis of results restricted to the time patients took the study drug showed the patients receiving EXANTA had 29 strokes and systemic embolic events compared to 52 events for patients on warfarin, a statistically significant relative risk reduction of 41 percent (p=0.018).

SPORTIF III was conducted in 3,407 patients in 23 countries in Europe, Asia, Australia and New Zealand. In the study, 1,704 patients with NVAF and at least one additional stroke risk factor received fixed-dose EXANTA (36 mg BID) and 1,703 patients received warfarin (dose-adjusted to an INR of 2-3). The SPORTIF program enrolled both newly treated patients and patients that were already on warfarin therapy. Patients were treated for a mean duration of 17.4 months. Warfarin was well controlled in the study with 66 percent of INR measurements between 2.0 and 3.0.

In the trial, there were 29 major bleeding events in the group receiving EXANTA compared to 41 in the warfarin arm (p=ns). The incidence of total bleeding events (major and minor bleeding) was 25.8% per year with EXANTA compared to 29.8% per year with warfarin (p=0.007). Additionally, 6.3 percent of patients treated with EXANTA experienced an increase to greater than three times the upper limit of normal of the liver enzyme alanine aminotransferase (ALT), compared to 0.8 percent of patients in the warfarin group. Nearly all enzyme changes occurred within the first six months of treatment and decreased with or without drug discontinuation.

SPORTIF III is one of two Phase III trials of the SPORTIF program. The SPORTIF program includes 7,329 patients. Results of the North American part of the program, SPORTIF V, which includes 3,922 patients at 409 sites, were presented at the American Heart Association 2003 Scientific Sessions on November 11.

29.    On December 6, 2003, the Company issued a press release entitled "Phase III Study Reports the Results of AstraZeneca's Investigational Oral Anticoagulant EXANTA(R) (ximelagatran) Following Total Knee Replacement (TKR) Surgery," which stated in relevant part as follows:

Results of a Phase III clinical trial comparing AstraZeneca's investigational oral anticoagulant EXANTA(R) (ximelagatran) with warfarin in patients following total knee replacement (TKR) surgery were presented at the 45th Annual Meeting of the

- 23 -

American Society of Hematology (ASH) in San Diego, CA. The objective of EXULT B (EXanta Used to Lessen Thrombosis) was to compare the efficacy of EXANTA with dose-adjusted warfarin (target INR 2.5) for the prevention of venous thromboembolism (VTE) and all-cause mortality in patients having undergone TKR surgery. Of the patients who had venography adequate for evaluation or confirmed symptomatic events (efficacy population), the incidence of total VTE and death was 22.5 percent of the 982 patients receiving EXANTA, and 31.9 percent of the 967 patients in the warfarin group (p<0.001).

The incidence of major bleeding on treatment (safety population) was 1 percent of the 1,151 patients treated with EXANTA and 0.4 percent of the 1,148 patients treated with warfarin (p=0.087). Any (major and/or minor) bleeding on treatment was 5 percent for EXANTA and 3.8 percent for warfarin (p=0.158). There were no statistically significant differences between the treatment groups with respect to bleeding events, pulmonary embolism (PE), or death. EXULT B was a multicenter, randomized, double-blind, double-dummy trial that included patients undergoing TKR surgery at 113 sites in five countries. Of the 2,303 patients randomized, 2,299 received treatment (safety population), and of these, 1,949 patients (84.8 percent) had venography adequate for evaluation or confirmed symptomatic events. Patients were given an oral, fixed dose of EXANTA 36 mg twice daily (n=982) with no coagulation monitoring or dose adjustment, initiated the morning after surgery, or warfarin (n=967) initiated the evening of the day of surgery. Treatment was administered for 7-12 days. Incidence of VTE was determined by mandatory bilateral venography or, if symptomatic, by objective means; the occurrence of VTE, major and minor bleeding events, and cause of death were judged by an independent central adjudication committee.

EXULT B was the second Phase III clinical trial in the EXULT program involving a total of 4,604 patients. EXULT A compared the efficacy of treatment with EXANTA to treatment with warfarin in reducing blood clots following TKR surgery. The objective of EXULT A was to optimize the dosage of EXANTA and compare its efficacy and safety with those of warfarin for the prevention of deep vein thrombosis (DVT), pulmonary embolism (PE) and all-cause mortality in TKR patients.

The THRIVE Treatment (oral direct THRombin Inhibitor ximelagatran for Venous thromboEmbolism) study, a Phase III trial for the therapy of VTE, was also presented at the 45th Annual Meeting of the American Society of Hematology.

30.   On December 23, 2003, the Company issued a press release entitled "AstraZeneca

Submits New Drug Application (NDA) for Investigational EXANTA(R) (ximelagatran) as First New

Oral Anticoagulant in Over 50 Years," which stated in relevant part as follows:

AstraZeneca announced today that it has submitted a New Drug Application (NDA) with the U.S. Food and Drug Administration (FDA) seeking marketing clearance for its investigational oral direct thrombin inhibitor EXANTA(R) (ximelagatran) for the

prevention of venous thromboembolism (VTE) in patients undergoing knee-replacement surgery; for the prevention of stroke and other thromboembolic complications associated with atrial fibrillation (AF); and for the long-term secondary prevention of VTE after standard treatment for an episode of acute VTE.

AstraZeneca also announced that regulatory submissions for EXANTA have been made in Europe to the Reference Member State, France, as part of the Mutual Recognition Procedure for use of EXANTA in prevention of stroke and other thromboembolic complications associated with AF and the treatment of VTE.

The US submission is based on data from more than 30,000 patients enrolled in all clinical studies, including the landmark SPORTIF program, involving 7,329 patients in total, examining the use of EXANTA as an alternative to warfarin for the prevention of stroke in patients with nonvalvular atrial fibrillation. In the clinical trial program for EXANTA, more than 17,000 patients received EXANTA.

EXANTA is the first oral anticoagulant to reach late-stage clinical trials since the development of warfarin more than 50 years ago. The intended mechanism of action of EXANTA is to inhibit the activity of an enzyme called thrombin, which is critical to the final step in the formation of blood clots. Clinical studies with EXANTA utilize a fixed dose without coagulation monitoring.

31.     Defendants presented at a Merrill Lynch conference on February 4, 2004, in New York, describing their successes in 2003, including obtaining their first approval for Exanta in France and filing the U.S. FDA NDA, and highlights, as follows:

## 2003 other highlights

✧ Launch of Crestor®

✧ First approval for Exanta® and regulatory submissions for key chronic indications

✧ Seroquel® approved for mania in bipolar disorder

✧ 14 compounds progressed to next phase of development

✧ 15 of high-quality candidate drugs entered into development



- 25 -

32.    On May 4, 2004, the Company issued a press release entitled "Successful Outcome

Of The Mutual Recognition Procedure For Exanta™ (Ximelagatran) In Europe," which stated in

relevant part:

> AstraZeneca announced today that it has successfully completed the Mutual
> Recognition Procedure (MRP) in Europe for Exanta™ (ximelagatran) for short-term
> use in the prevention of venous thromboembolic events in major elective orthopaedic
> surgery (hip or knee replacement) – the 'proof of concept' indication for this new
> anticoagulant.
>
> France acted as the Reference Member State for the MRP, with approval in this first
> market achieved in December 2003. National Marketing Authorisations for an
> additional 14 countries will be issued in the coming months. UK and Ireland have
> been withdrawn from the MRP and regulatory discussions will be held to agree the
> appropriate route to secure approval of Exanta in orthopaedic surgery in these
> countries.
>
> Dr Hamish Cameron, Vice President, Head of Exanta, AstraZeneca, said, "As Exanta
> is the first new oral anticoagulant in nearly 60 years, completion of this first
> regulatory review in orthopaedic surgery is a historic milestone as we approach the
> introduction of this innovative new therapy."
>
> Completion of the MRP for this first indication for Exanta was based on the
> extensive clinical programme and in particular the METHRO III study. The approved
> treatment regimen involves an early postoperative start of Exanta, with initial
> injectable dosing administered 4-8 hours after the completion of surgery, followed by
> oral Exanta 24mg twice daily for up to 11 days. This approach reflects the changing
> trends in clinical practice across Europe with increasing use of spinal anaesthesia as
> well as enabling oral treatment, to be easily continued following discharge from
> hospital.
>
> More than half of patients undergoing major orthopaedic surgery can develop
> thromboembolic complications in the absence of preventative anticoagulant
> treatment, and while effective treatments are available, no treatment regimen to date
> has successfully balanced efficacy and bleeding risk with oral dosing.
>
> Exanta is the first oral therapy in a new class of direct thrombin inhibitors to protect
> patients against thrombosis. Exanta is currently under regulatory review in the E.U.
> for key chronic-use indications including the prevention of stroke and other
> thromboembolic complications associated with atrial fibrillation and the treatment of
> venous thromboembolism (VTE). In the US, FDA submissions were filed in
> December 2003 for stroke prevention in patients with atrial fibrillation and long-term
> secondary prevention of VTE, as well as for use of Exanta in prevention of VTE in
> major elective orthopaedic surgery (knee replacement).

- 26 -

The worldwide market for anticoagulants is around $4 billion and growing at 13 per cent annually, while the worldwide anti-thrombotic market is around $12 billion, growing at 15 per cent annually.

33.    Defendants presented at the Exane Pharma Conference in Paris on May 10, 2004, highlighting Exanta's success and describing it as one of the main products that would drive the Company's replacement of lost Prilosec revenues:



34.    At the Exane conference, Defendants also touted Exanta's virtues and commented on how Exanta's launch would contribute to the Company's 2004 earnings per share:





35.    On this news, the Company's stock price rose to its Class Period-high above $51 per share on March 10, 2004.

36.    The same slides were presented and comments were repeated at the HSBC SRI briefing in London on May 26, 2004. Meanwhile, on May 20, 2004, the Company announced its successful global bond market debut, issuing a total of $750 million and stating the proceeds of the issue would be used for "general corporate purposes."

37.    At the Goldman Sachs Healthcare Conference on June 10, 2004, Defendants made positive statements concerning the status of the Exanta NDA and how it would contribute to a projected $2 - $2.15 earnings per share in 2004:

## 2004 priorities

- Continue to build Crestor® into megabrand
- Drive Oncology portfolio
- Progress to US market leadership for Nexium® and Seroquel®
- First launches for Exanta® and register chronic claims
- Advance development projects
- Continuous improvement in productivity



2004 EPS range in range of $2. 00 to $2.15

8    AstraZeneca

38.    The June 10, 2004 presentation contained many positive statements about Exanta's usefulness but made no mention of the cardiac problems, liver toxicity or the lower than promised efficacy of Exanta:

- 29 -

## Exanta® - Oral Direct Thrombin Inhibitor

- Prompt onset and offset of anticoagulation
- Wider therapeutic margin than warfarin
- Predictable pharmacokinetics
- Low potential for food and drug interactions
- No dose adjustment
- No coagulation monitoring
- Elevation of ALAT in some patients

- OS indication (EU)
  - First EU approval– Dec 03
  - MRP EU (15-17 countries) – May 04
- Submissions for chronic indications in EU/US – Dec 03



39.    On June 21, 2004, the Company issued a press release entitled "First Launch For AstraZeneca's Exanta™ (Ximelagatran): The First Oral Anticoagulant In New Class Of Direct Thrombin Inhibitors (DTIS)," which stated in relevant part that:

Exanta™ (ximelagatran), a new anticoagulant and the first oral treatment in the new class of direct thrombin inhibitors (DTIs), is launched today in Germany in its first indication: the prevention of venous thromboembolic events (VTE) in elective hip or knee replacement surgery (orthopaedic surgery).

Exanta is the first oral anticoagulant since the introduction of warfarin almost 60 years ago, and is the product of over 20 years' research and development at AstraZeneca. It was developed to provide a solution to the significant unmet medical need for a new, predictable and well-tolerated oral therapy for patients at risk of thrombosis, one of the major causes of cardiovascular morbidity and mortality in the developed world.

The prevention of VTE in orthopaedic surgery is an important proof of principle indication for Exanta and follows the successful completion of the E.U. Mutual Recognition Process for this indication in May 2004. Patients are particularly at risk of thrombosis following orthopaedic surgery, with more than half developing VTE in the absence of preventative anticoagulant treatment. Whilst effective treatments are available, no treatment regimen to date has successfully balanced efficacy and bleeding risk with oral dosing.

The approved label in the E.U. for Exanta in this indication involves an early postoperative start of treatment, with initial injectable dosing administered 4 – 8 hours after the completion of surgery, followed by oral Exanta 24mg twice daily for up to 11 days. This approach supports the increasing use of postoperative initiation of VTE preventative treatment in clinical practice across Europe, and also enables oral treatment to be easily continued following discharge from hospital.

*"Clinical studies have shown the potential that Exanta offers as a new approach to the prevention and management of thrombosis. I am excited that this new oral anticoagulant is now becoming available for orthopaedic surgery patients" commented Professor Bengt Eriksson, Department of Orthopaedics, Sahlgrenska/Östra University Hospital, Gothenburg, Sweden, and Lead Investigator in European orthopaedic surgery study programme.*

Exanta has been the subject of the largest clinical study programme in anticoagulation to date, involving around 30,000 patients. It is under regulatory review in the E.U. for key chronic use indications including the prevention of stroke and other thromboembolic complications associated with atrial fibrillation and the treatment of venous thromboembolism (VTE). In the US, FDA submissions were filed in December 2003 for use of Exanta in prevention of VTE in patients undergoing knee replacement surgery as well as for prevention of stroke and other thromboembolic complications associated with atrial fibrillation and long-term secondary prevention of VTE after standard treatment for an episode of VTE.

"Exanta is an innovative new approach to the treatment and prevention of thrombosis," commented Dr Hamish Cameron, Vice President, Head of Exanta, AstraZeneca. "We are proud to be able to launch Exanta in this initial indication, as the first oral anticoagulant in almost 60 years."

40.    On August 4, 2004, the Company presented its 2Q '04 financial results and projections for the second half of 2004, making positive statements about the status of the pending NDA for Exanta, including repeating that its "launch" would help drive the Company's projected earnings per share range for 2004 of $2 to $2.15 per share:



41.    As to the current regulatory status, Defendants stated in the 2Q '04 presentation only that:



42.    Defendants' statements concerning the results of the clinical trials and the status and probability of success of the NDA were consistently and increasingly false and misleading throughout the Class Period as they failed to disclose and misrepresented the following material adverse facts, which were known to defendants at all relevant times or recklessly disregarded by them:

(a)    that Exanta actually failed to produce any clinically or statistically significant differences versus warfarin in reducing the frequency of proximal DVT, PE, and/or all-cause mortality in the prevention of VTE in patients undergoing elective total knee replacement (TKR) surgery;

(b)    that based on the study results submitted to the FDA, the agency would conclude that the use of EXANTA risked higher coronary artery disease adverse events, including acute myocardial infarction;

(c)    that based on the study results submitted to the FDA, the agency would conclude that long-term use of EXANTA was directly linked to irreversible life-threatening liver toxicity, causing as many as 37 cases of severe liver injury and 3 deaths related to liver toxicity during the trials, as well as generally undesirable increases in the level of hepatic transaminases;

(d)    that the basic study design for the use of EXANTA in the prevention of VTE in patients undergoing elective total knee replacement (TKR) surgery was biased and unfair, since the warfarin comparator drug would take about 3-5 days to reach therapeutic level, while EXANTA reaches therapeutic levels within hours;

(e)    that the basic study design for the use of EXANTA in the prevention of VTE in patients undergoing elective total knee replacement (TKR) surgery was biased and unfair, since the warfarin comparator drug was not approved for this short-term indication;

- 33 -

(f)     that even when warfarin was considered as a placebo, ximelagatran 24 mg bid was not superior to warfarin in reducing total VTE and/or all-cause mortality (27.6% warfarin vs. 24.9% ximelagatran 24 mg) at the end of 7-12 days of therapy;

(g)     that the FDA had not agreed to an extremely liberal pre-specified non-inferiority margin of two percentage points in the event rate in the study of EXANTA for the prevention of stroke and other thromboembolic complications associated with atrial fibrillation, rendering meaningless Defendants' results and conclusions regarding the "non-inferiority" of Exanta relative to warfarin;

(h)     that since there were more deaths in patients exposed to EXANTA versus those exposed to warfarin, including deaths where pulmonary embolism could not be excluded, the very safety of EXANTA was in doubt;

(i)     that since there were more "discontinuations of study drug due to adverse events" in patients exposed to EXANTA versus those exposed to warfarin, the very safety of EXANTA was in doubt;

(j)     that since there were more adverse events in patients exposed to EXANTA versus those exposed to warfarin, including incidences of hematuria, rectal hemorrhage/melaena, alanine aminotransferase (ALAT) elevation, coronary artery disease adverse events (myocardial infarction or ischemia/angina) and deaths where pulmonary embolism could not be excluded, the very safety of EXANTA was in doubt;

(k)     that based on the study results submitted to the FDA the agency would conclude that EXANTA posed serious safety risks when used in the prevention of VTE in patients undergoing elective knee replacement surgery;

(l)     that ximelagatran-associated fatal liver injury or liver failure could occur in as many as 1 in 2,000 patients treated long-term (i.e., 10% of 1 in 200);

(m)     that since the EXANTA (ximelagatran) Risk Minimization Action Plan (RiskMAP) submitted by AstraZeneca to FDA as part of its new drug application (NDA 21-686) failed to address the very safety risks encountered during the clinical studies, the agency would deem it unacceptable; and

(n)     that since no adequate mechanism to prevent or limit liver toxicity was demonstrated on the basis of the clinical studies and information submitted to FDA, the EXANTA (ximelagatran) Risk Minimization Action Plan (RiskMAP) was utterly useless as a plan to limit hepatotoxicity risk in individual patients.

## DEFENDANTS' SERIOUS MISREPRESENTATIONS AND OMISSIONS BEGIN TO BE REVEALED

43.     AstraZeneca's stock/ADR prices were rising until September 9, 2004 when FDA staffers posted briefing documents on its website for the FDA's Advisory Committee to use at the Committee's September 10, 2004 meeting. Although the data supporting Exanta's approval had been presented at major medical meetings, including the annual scientific sessions of the American Heart Association, the briefing documents brought up previously unheard-of problems. First, AstraZeneca's trials had overstated Exanta's equivalency to the gold-standard blood thinner, warfarin. Second, the FDA found that Defendants had seriously understated the liver toxicity problem associated with Exanta. Third, a short-term study had indicated the blood thinner might increase the risk of heart attacks. With a seriously increased measure of safety risks and without a clear-cut win on efficacy, Exanta's chances of FDA approval had been torpedoed.

44.     In the FDA briefing documents, Exanta was compared to Rezulin, a diabetes drug that Pfizer had been forced to remove from the market because of similar liver problems after it got FDA

- 35 -

approval. The FDA said that drug-induced liver injury was the top cause of acute liver failure, a rare disease that could produce critical illness in a few days, cause death, or necessitate a liver transplant. The FDA pointed out that drug-induced liver injury is the leading reason why drugs are removed from the market and why the FDA requires restricted use of certain drugs and special monitoring of patients. AstraZeneca was lambasted in the media for: (i) not taking known liver toxicity problems seriously in its own testing; (ii) not providing the FDA with real patient treatment options to the liver toxicity problems; and (iii) concealing the full extent of Exanta's liver toxicity problems until the September 9th FDA briefing documents leaked out.

45.     The Company's stock price fell precipitously in a few trading sessions beginning on September 9, 2004, from approximately $47 per share to $42 per share.

46.     On September 10, 2004, the FDA's Center for Drug Evaluation and Research, Cardiovascular and Renal Drugs Advisory Committee held a meeting led by Joyce Korvick, M.D., M.P.H Acting Division Director Division of Gastrointestinal and Coagulation Drug Products, on Exanta's NDA. Present from AstraZeneca were Hamish Cameron, M.D., Vice President, Exanta, Troy C. Sarich, Ph.D., Director, Clinical Pharmacology, Sunita Sheth, M.D., FAHA, Senior Director, Clinical Development, and Jay Horrow, M.D., MS, Senior Director, Clinical Development. Among others, the Advisory Committee asked the following pointed questions concerning Exanta's liver toxicity:

- •     What is your level of concern (none, low, moderate, high) for the risk of liver toxicity with use of ximelagatran:

a) For prevention of stroke and systemic embolic events in patients with atrial fibrillation?

b) For secondary prevention of venous thromboembolism (VTE) after 6 months standard treatment for an episode of acute VTE?

c) For prevention of VTE in patients undergoing elective total knee replacement

surgery (TKR)?

For each response please explain.

- Based on currently available data, is it possible to identify patients who are at risk for developing severe liver toxicity after exposure to ximelagatran?

- Did the sponsor's study procedures for monitoring and managing patients with regard to liver function adequately minimize the risk of severe liver injury and liver failure in the clinical studies?

- Do you recommend additional safety studies with longer follow-up to address the possibility of delayed occurrence of liver toxicity following short-term use?

- Do you recommend additional safety studies with longer follow-up to address the possibility of delayed occurrence of liver toxicity for short-term use?

47.     Defendants were also asked pointed questions concerning Exanta's efficacy, which

were responded to by Jonathan L. Halperin, M.D., Mount Sinai Medical Center, New York, New

York, for AstraZeneca:

- Is the non-inferiority margin of 2% compared to warfarin adequate to ensure that ximelagatran is non-inferior to warfarin with respect to efficacy? If no, what should be the non-inferiority margin be for the indication of prevention of stroke and systemic embolic events in patients with atrial fibrillation?

48.     At the September 10, 2004 Advisory Committee meeting, Kate Gelperin, M.D.,

M.P.H. Medical Officer Division of Drug Risk Evaluation Office of Drug Safety, presented the

FDA's Risk Assessment/Risk Management of EXANTA® (ximelagatran) Liver Injury, concluding

that:

- ***Substantial risk of severe liver injury seen in LTE population***

- ***1 in 200 ximelagatran-treated patients (0.5%) experienced severe liver injury***

- ***Fatal liver injuries*** also occurred

49.     Dr. Gelperin's findings demonstrated that Exanta use carried with it considerably

more liver toxicity risk than the drugs it was compared to -- with Exanta-users having between an 8

- 37 -

to 10 percent risk of liver toxicity and users of the other drugs having approximately a 1% risk of liver toxicity. Gelperin's report showed that AstraZeneca's own data supplied to FDA showed that 19/6948 Exanta-users, versus 2/6230 of the "comparator," developed liver toxicity problems, showing a relative risk of 8.5. Dr. Gelperin's finding go on to state that "For 100,000 similar patients who receive one year of [Exanta] treatment: • *—500 patients will develop severe liver injury —≥10% (or 50 patients) likely to progress to liver failure, transplant, or death* – •Consistent with this prediction, three liver related deaths were noted in long term trials = one fatal liver injury in 2,300 patients." Ultimately, Dr. Gelperin's report found that:

- Concern: *unlikely that long term hepatotoxicity risk will be adequately minimized by sponsor's proposed RMP of monitoring.*

- *Sponsor has not demonstrated that: —Compliance with monitoring postmarketing would protect patients.* –Even if full compliance achieved, that ALT monitoring can prevent serious liver injury with this drug. –

- *Sponsor has not proposed a strategy to prevent prolonged use after total knee replacement.*

- *[Exanta] can cause severe, and even fatal liver injury in some patients*

- *Initial signs in patients who developed severe liver injury were noted during the first month of Exanta use in 6 LTE patients*

- *Ability of transaminase monitoring to minimize risk of severe or fatal liver injury remains unproven for [Exanta]*

50.    On September 10, 2004, the FDA Advisory Committee issued its report on the Assessment of Efficacy and Safety of Exanta, with Ruyi He, M.D., Medical Team Leader the Division of Gastrointestinal and Coagulation Drug Products, finding as to Exanta's long-term efficacy:

- *[AstraZeneca's] pre-specified 2% non-inferiority margin too liberal*

- *SPORTIF III & V produced divergent results*

- 38 -

- ***Based on the double-blind, SPORTIF V study, it could not be ruled out that the risk of stroke/SEE was 2-fold greater on Exanta compared to Warfarin (95% CI = (0.91, 2.12))***

51.     The FDA Advisory Committee also cited the following long-term exposure safety concerns:

- ***Higher incidence (0.53%) of severe liver injury*** (ALT >3x ULN + T. Bili. >2x ULN), ***including 3 deaths despite protocol specified LFT monitoring scheme.***

- ***Higher incidence of withdrawal due to AE, including acute MI/CAD and bleeding events.***

- In VTE population, ***higher incidence of acute MI/CAD with Exanta***, including in placebo control study.

52.     On September 13, 2004, the Company issued a press release entitled "FDA Advisory Committee Recommends Further Data To Support Approval Of AstraZeneca's Oral Anticoagulant Exanta™ (Ximelagatran)," which stated in relevant part that:

> AstraZeneca today announced that the Cardiovascular and Renal Drugs Advisory Committee to the US FDA has advised that more data is needed to support the approval of the oral anticoagulant Exanta™ (ximelagatran).

> Despite the Committee members' recognition of the need for a new oral therapy to complement warfarin in the treatment of thrombotic disorders, the Committee advised that the indications for the prevention of strokes in patients with atrial fibrillation (AF), for the prevention of blood clots in patients undergoing knee replacement surgery, and for the long term secondary prevention of blood clots following standard treatment of a clot, should not be recommended on present data.

53.     The FDA advisory panel's recommendation caused at least three investment banking firms in Europe to cut their ratings and at least six firms to reduce their price targets. AstraZeneca had previously traded at a premium to its European peers, in large part because "the market has grown comfortable" with its "ability to execute on its pipeline," according to Gbola Amusa of Sanford C. Bernstein & Co. "With Exanta now in danger of FDA rejection ***and no pipeline heir apparent to succeed it***, the market may no longer see the AstraZeneca pipeline as a safety net," Amusa said in a research report. The news created quite a jolt for the stock price of the company

that has outperformed an index of its peers as well as the S&P 500 since Sweden's Astra and Britain's Zeneca merged in April 1999. From April 9, 1999, to Sept. 3, 2004, just before the Exanta vote, AstraZeneca's total return -- stock price appreciation plus reinvestment of dividends -- was 17.6%. The total return for the Amex Pharmaceutical Index of 15 stocks (including AstraZeneca) was minus 15%. The total return for the S&P 500 index was minus 10.6%. But things have changed. AstraZeneca's total return this year through Sept. 17 was minus 12%; the drug index total return was minus 2.2%, and the S&P 500's total return was plus 2.7%.

54.    On or about September 30, 2004, John Sherman, T.Rowe Price analyst, told the *Wall Street Journal* "If Exanta doesn't make it to market, which is what the market certainly expects, then they don't really have much of a pipeline left. So while earnings growth over the next few years will be high and quite effective, with drug stocks people want to know the growth is sustainable, and that comes in the form of the pipeline. And there's not much there in the late stage."

55.    On October 6, 2004, the Company stated that its earnings per share would still be in the middle of the $2 - $2.15 per share range given throughout the year, despite the problems with Exanta. Many analysts expressed disappointment with the Company's earnings outlook for 2004, having predicted that guidance would be nearer the top of AstraZeneca's target range. AstraZeneca Vice President Hamish Cameron told analysts the Company was confident it would manage liver toxicity risks for its anticoagulant drug Exanta. Commerzbank downgraded its rating on the stock to underweight from equalweight, cutting its target price to GBP20 from GBP25.

56.    Despite its October 6th optimism about working with the FDA to get Exanta approved, on October 11, 2004, the Company issued a press release entitled "AstraZeneca Receives Action Letter From FDA For Exanta®," which stated in relevant part that "the US Food and Drug Administration (FDA) did not grant approval for the investigational oral anticoagulant EXANTA®

- 40 -

(ximelagatran)." The Company's stock ratings were immediately slashed to "underperform" from

"peerperform" by Bear Stearns and Deutsche Bank lowered its target from £2900 to £2600.

57.    On October 11, 2004, *The Wall Street Journal* published an article entitled

"AstraZeneca to Take a Charge Following U.S. Drug Rejection," which stated in relevant part that,

> AstraZeneca PLC said it will have to take a charge against 2004 earnings after U.S.
> regulators rejected its new anticlotting drug Exanta, but a company spokesman
> declined Monday to say how much the write-down would be.
>
> The decision late Friday by the U.S. Food and Drug Administration, dashing hopes
> for a drug previously touted as a $3 billion-a-year seller, came as no surprise; an
> advisory panel had recommended against approval last month. ***But it means
> inventories of the drug currently held on AstraZeneca's balance sheet will have to
> be written down.***
>
> *    *    *
>
> The U.S. agency rejected the drug for all its proposed uses.
>
> Exanta has been associated with raised liver enzymes, a possible sign of organ
> damage in some patients.
>
> *    *    *
>
> Before taking into account the possible charge, Mr. McKillop had said he expected
> earnings per share this year to be the middle of the company's $2.00 to $2.15
> forecast range, compared with $1.78 in 2003. A company spokesman declined to
> give further details.
>
> Analysts at ABN Amro said they believed the charge could amount to around five
> cents a share.
>
> AstraZeneca shares closed at £21.80 (€31.48), up 15 pence, on the London Stock
> Exchange. The stock has fallen some 17% since serious concerns about whether
> Exanta would be approved were first raised last month.

58.    Analysts now estimate that the write-down associated with the drug will be $70

million for "stockpiled tablets and bin promotional leaflets." With the rollout in Europe already

haven taken place and the key U.S. market rejecting the drug, significant inventory will have to be

written down – both inventory built up destined for the U.S. and inventory that will now not sell as

well in Europe.

- 41 -

59.     On the news of the FDA's action letter, the Company's stock price declined to $38 per share following the October 11th announcement, erasing millions of dollars in market capitalization from the Class Period high of $51.20 per share reached on March 9, 2004 on the NYSE, £2,894 per share reached on October 28, 2003 on the London stock exchange, and SEK 380.50 per share reached on October 29, 2003 on the Stockholm exchange.

### FIRST CLAIM FOR RELIEF

#### For Violation of §10(b) of the 1934 Act
#### and Rule 10b-5 Against All Defendants

60.     Plaintiff incorporates ¶¶1-59 by reference.

61.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)     Employed devices, schemes, and artifices to defraud;

    (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

    (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of AstraZeneca publicly traded securities during the Class Period.

63.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AstraZeneca publicly traded securities. Plaintiff

and the Class would not have purchased AstraZeneca publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

64.    As a direct and proximate result of these Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of AstraZeneca publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

65.    Plaintiff incorporates ¶¶1-64 by reference.

66.    The executive officers of AstraZeneca prepared, or were responsible for preparing, the Company's press releases and SEC filings.    The Individual Defendants controlled other employees of AstraZeneca.    AstraZeneca controlled the Individual Defendants and each of its officers, executives and all of its employees.    By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased AstraZeneca publicly traded securities (the "Class") on the open market during the Class Period.    Excluded from the Class are Defendants, directors and officers of AstraZeneca and their families and affiliates.

68.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period AstraZeneca had more than 4 billion shares of stock outstanding, owned by thousands of persons.

- 43 -

69.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the 1934 Act was violated by Defendants;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 27, 2005                    By his attorneys,

Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA 02109
Telephone: 617/439-3939
617/439-0134 (fax)

- 44 -

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
MARY K. BLASY
401 B Street, Suite 1700
San Diego, CA  92101-4297
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

G:\srudman\Astrazeneca\Complaint-revised.doc

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
(561) 750-3000
(561) 750-3364 Facsimile

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, **Raymond Tyler** ("Plaintiff"), declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.     Plaintiff has reviewed the **AstraZeneca** complaint and authorized its filing.

2.     Plaintiff did not purchase any common stock/securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.     The following includes all of Plaintiff's transactions during the Class Period specified in the complaint for the common stock/securities that are the subject of this action:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| AstraZeneca (AZN) | Purchase | 150 | 1/30/04 | 47.85 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Please list additional transactions on a separate sheet if necessary.

5.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:

CP Ships, Alliance Gaming

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25 day of
_____ , 2005.

_____
SIGNATURE

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

RAYMOND TYLER

DEFENDANTS FILED

ASTRAZENECA PLC, PERCY BARNEVIK, TOM MCKILLOP, JONATHAN SYMONDS and HAKAN MOGREN

IN CLERKS OFFICE

**(b)** County of Residence of First Listed Plaintiff    OUT OF STATE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed    2005 JAN 27  P 3: 43
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.    U.S. DISTRICT COURT
DISTRICT OF MASS.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Theodore M. Hess-Mahan    Tel: (617) 439-3939
Shapiro Haber & Urmy LLP    Fax: (617) 439-0134
53 State Street
Boston, MA 02109

Attorneys (If Known)

05 cv 10167 NMG

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | X 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL INJURY** ☐ 362 Personal Injury— Med. Malpractice ☐ 365 Personal Injury Product Liability ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck ☐ 650 Airline Regs. ☐ 660 Occupational Safety/Health ☐ 690 Other | **PROPERTY RIGHTS** ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 810 Selective Service X 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 151 Medicare Act ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability | **PERSONAL PROPERTY** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage | **LABOR** ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act |
| ☐ 160 Stockholders' Suits ☐ 190 Other Contract ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | ☐ 441 Voting ☐ 442 Employment ☐ 443 Housing/ Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence **Habeas Corpus:** ☐ 530 General ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition | ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS–Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

15 USC §§78j(b) and 78t(a) and 17 CFR 240.10b-5

## VII. REQUESTED IN COMPLAINT:

X CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 0    CHECK YES only if demanded in complaint:
JURY DEMAND:   X Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____    DOCKET NUMBER _____

DATE  1/27/2005

SIGNATURE OF ATTORNEY OF RECORD

Theodore M. Hess-Mahan

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Raymond Tyler v. AstraZeneca PLC, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   ___    I.       160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   X    II.      195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,     *Also complete AO 120 or AO 121
                       740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.     for patent, trademark or copyright cases

   ___    III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                    315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                    380, 385, 450, 891.

   ___    IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                    690, 810, 861-865, 870, 871, 875, 900.

   ___    V.     150, 152, 153.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                               YES ☐    NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

                                 YES ☐    NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                 YES ☐    NO ☒

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                 YES ☐    NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                 YES ☒    NO ☐

     A.    If yes, in which division do all of the non-governmental parties reside?

          Eastern Division ☒      Central Division ☐      Western Division ☐

     B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

          Eastern Division ☐      Central Division ☐      Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

                                 YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME Theodore M. Hess-Mahan

ADDRESS Shapiro Haber & Urmy LLP, 53 State Street, Boston, MA 02109

TELEPHONE NO. (617) 439-3939

(AstraZeneca Category Form.wpd - 10/17/02)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.     Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.     Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.